318 F.2d 894
 PACIFIC SUPPLY COOPERATIVE, an Oregon Cooperative Corporation, Appellant,
v.
FARMERS UNION CENTRAL EXCHANGE, INCORPORATED, a Minnesota Corporation, and
National Cooperatives, Inc., a District of Columbia Corporation, Appellees.
 No. 17967.
 United States Court of Appeals Ninth Circuit.
 June 3, 1963.
 Rehearing Denied July 16, 1963.
 
 Sherwood, Tugman & Green and Cameron Sherwood, Walla Walla, Wash., Comfort, Dolack & Hansler, and Robert A. Comfort, Tacoma, Wash., for appellant.
 Doherty, Rumble & Butler and Eugene M. Warlich, St. Paul, Minn., Houghton, Cluck, Coughlin & Schubat, and Jack R. Cluck, Seattle, Wash., Richard H. Magnuson, St. Paul, Minn., for appellee Farmers Union Central Exchange, Inc.
 Chadwick, Chadwick & Mills and Orville H. Mills, Seattle, Wash., Beale & Jones, and Irving M. Tullar, Washington, D.C., for appellee National Cooperatives, Inc.
 Before BARNES, Circuit Judge, MADDEN, Judge, United States Court of Claims, and DUNIWAY, Circuit Judge.
 BARNES, Circuit Judge.
 
 
 1
 This is a trademark infringement and unfair trading case, involving as well alleged inducement to breach, and interference with, plaintiff-appellant's contractual relations with its affiliated local member cooperatives, and with third party defendant, National Cooperatives, Inc.
 
 
 2
 The party plaintiff, Pacific Supply Cooperative, the defendant, Farmers Union Central Exchange, Inc., and the third party defendant, National Cooperatives, Inc., are all nonprofit cooperative corporations. They will be hereinafter referred to respectively as "Pacific", "FUCE", and "National". Pacific is the appellant; both FUCE and National are appellees.
 
 
 3
 Pacific, FUCE and National are organized under the laws of Oregon, Minnesota and the District of Columbia, respectively, with principal places of business at Walla Walla, Washington; South St. Paul, Minnesota; and Albert Lea, Minnesota.
 
 
 4
 This is an interlocutory appeal, under Rule 54(b) of the Federal Rules of Civil Procedure, from a judgment of dismissal of all claims against appellee National and the claims arising from the trademark issue, and the related issues of pendent unfair competition, raised against appellee FUCE, preserving the action against FUCE on other issues. The express determination by the trial court, required by Rule 54(b), was made and, as well, that there was no genuine issue of fact as to any matter covered by the judgment.
 
 
 5
 Jurisdiction rests not only upon diversity (28 U.S.C. § 1332), and the federal statutes relating to trademarks and unfair competition (28 U.S.C. § 1338), but, as appellant states, is generally founded upon the Trademark Act of July 5, 1946 (the Lanham Act)[1] "and specifically on Section 39 of that Act [15 U.S.C. § 1121]." Jurisdiction on this appeal rests on 15 U.S.C. § 1121 and 28 U.S.C. § 1291.
 
 
 6
 National was not in the case originally, but was brought in as an indispensable party by order of the trial court.
 
 
 7
 The parties strongly disagree in their factual statement. Appellant's factual statement is marred by frequent references to rulings of the trial judge which it alleges were improper or inconsistent, interspaced with argument and criticism direct and implied relative to such rulings, and the alleged merits of its case.
 
 
 8
 Appellees' attack on appellant's brief, and its motion to dismiss the appeal on the ground it constitutes a flagrant violation of Rule 18(c) and (e) of this court, has substance. There are inadequate record references to alleged facts; there are vital and essential omissions from quoted material; and there are references to documents stricken from the record by the trial court without reference to the court's having so ruled. Appellant's brief is far from a model.
 
 
 9
 This court cannot condone such a presentation. Every appellate court is tempted to summarily grant such a motion as is here before us, for it seems the only way to bring the court's requirements as to brief home to counsel with sufficient force as to cause counsel to follow and obey our rules of court. Yet most judges are plagued with the conviction that the sins of attorneys should not be visited upon their clients. With that thought uppermost, we decline to dismiss the appeal as moved by FUCE.
 
 
 10
 We proceed to the merits. Appellee National, critical of appellant's factual statement, lists certain stipulated facts, quoting the record and citing transcript page numbers for each statement made. Pacific denies that such stipulated facts are "controlling" (Reply Br. p. 3) (as they are characterized by National), but does not dispute in any way the correctness of the stipulated facts so referred to. For that reason, we adopt such statement, with its references to the record:
 
 PORTION OF STIPULATED FACTS
 
 11
 "I
 
 
 12
 "Prior to the organization of National Cooperatives, Inc., an Indiana corporation and subsequently by the reorganization, a District of Columbia cooperative corporation, the Midland Cooperative Oil Association, Minneapolis, Minnesota (later, Midland Consumers Co-op) and the Union Oil Company Co-operative, Kansas City, Missouri (later, Consumers Cooperative Association) adopted and used the trademark `CO-OP' on and in connection with the advertising, manufacture, sale and distribution of various products, including petroleum products, tires and tubes." (R. 1451-1452; 9010-9011)
 
 
 13
 "II
 
 
 14
 "Prior to the organization of National, Midland Cooperative Oil Association and the Union Oil Company Cooperative lawfully registered the trademark `CO-OP' in the United States Patent Office." (R. 1452; 9011-9012)
 
 
 15
 "III
 
 
 16
 "Prior to the organization of National and in 1932, six cooperative associations, i. e.:
 
 
 17
 "1. Walla Walla Farm Bureau, Inc., Walla Walla, Washington
 
 
 18
 "2. Farmers Union Oil and Supply Co., Coeur d'Alene, Idaho
 
 
 19
 "3. Twin City Oil and Gas Company, Milton-Freewater, Oregon
 
 
 20
 "4. Farmers Union Oil Company of Polk County, Salem, Oregon
 
 
 21
 "5. Farm Bureau Co-op, Hermiston, Oregon and
 
 
 22
 "6. Cooperative Oil Company, Caldwell, Idaho were local retail cooperatives supplying their members with tires, tubes and other products bearing the trademark `CO-OP' so registered by the predecessor of Midland Cooperative Oil Association and by Union Oil Company Cooperative." (R. 1452; 9012-9013)
 
 
 23
 "IV
 
 
 24
 "National was first organized on February 23, 1933, under the laws of Indiana, with principal office in Chicago, Illinois, as a cooperative corporation, for the purpose, among others, of pooling purchasing power, obtaining and registering trademarks, including those involved in this litigation, and for the purpose of obtaining supplies for sale and distribution to its members and identified by such trademarks. Substantially all of National's business is with its regional wholesale cooperatives. Its charter members comprised six regional wholesale cooperatives, including Midland Cooperative Oil Association, later Midland Consumers Cooperative, Union Oil Company Cooperative, now Consumers Cooperative Association, and Farmers Union Central Exchange, Inc., hereinafter referred to as FUCE. Said regional wholesale cooperatives, including FUCE, have continued as members and shareholders of National to date." (R. 1452-1453; 9014-9015)
 
 
 25
 "V
 
 
 26
 "In the organizational meetings of National arrangements were initiated for the assignment and the transfer of the trademark `CO-OP' to National by Midland Cooperative Oil Association and Union Oil Company Cooperative, which resulted by terms of the assignments in the transfer of the entire right, title and interest in and to said trademarks and the good will of the business symbolized thereby, to National, as shown by Exhibits ...... and ......" (R. 1453; 9015-9016)
 
 
 27
 "VI
 
 
 28
 "Subsequent to the organization of National and on December 19, 1933, the six local retail cooperatives identified in Paragraph III caused plaintiff, Pacific, to be organized with its principal office in Walla Walla, Washington. Upon organization Pacific applied for membership in National and the benefits thereof as a regional wholesale cooperative, and such application was accepted at a meeting of the board of directors of National, held February 12, 1934. At all times since, Pacific has been a regional wholesale cooperative and member shareholder of National." (R. 1453-1454; 9016)
 
 
 29
 "VII
 
 
 30
 "National, as now reorganized, is a non-profit cooperative association organized under Act of Congress, June 19, 1940, Public No. 642, 76th Congress, 54 Stat. 480, with principal office in Albert Lea, Minnesota. The reorganized corporation acquired all of the assets and assumed all of the liabilities of its predecessor. The membership of National is now composed of 26 regional wholesale cooperatives with equal rights, operating in most of the principal parts of the United States and in some parts of Canada. National's board is composed of representatives of the regional members. All capital of National, except loan capital, has been contributed by the regionals." (R. 1454; 9016-9017)
 
 
 31
 "VIII
 
 
 32
 "Pacific is a non-profit cooperative corporation, organized under Oregon Revised Statutes, Section 77-5-01, et seq., as a regional wholesale cooperative engaged in supplying farm supplies, including petroleum products, tires and tubes, to local retail cooperatives and marketing farm crops. Pacific, since 1950, has done business with about 120 local retail cooperatives. These locals own the voting shares of Pacific and serve at least fifty thousand farm families. All capital of Pacific, except preferred stock and loan capital, has been contributed by local retail cooperatives. Approximately 90% of these retail cooperatives are located in Washington, Idaho and Oregon, of which about 16 are located in Washington, at present. Pacific also does business in the following states: Northern California, Western Montana, Wyoming and Alaska. Pacific is licensed to do business in the foregoing states. About 40% of Pacific's gross volume is in petroleum products and about 15% is in crop marketing transactions. Pacific has never refined petroleum products." (R. 1454; 9017-9018)
 
 
 33
 "IX
 
 
 34
 "FUCE is a non-profit cooperative corporation, organized under Minnesota statutes, Section 308.05, et seq., as a regional wholesale cooperative, with its principal office in South St. Paul, Minnesota. It is engaged in supplying farm supplies, including petroleum products, some of which it produces and refines, also tires and tubes, to local retail cooperatives. These locals own the voting shares of FUCE and serve at least 250,000 farm families. All capital of FUCE except loan capital has been contributed by local retail cooperatives. FUCE now does business in the following states: Wisconsin, Minnesota, North Dakota, South Dakota, Montana, Wyoming, Idaho, Washington and Oregon. About 65% of FUCE gross volume is in petroleum products. Since 1943 FUCE has operated a refinery at Laurel, Montana. Since September, 1954, FUCE has transported petroleum products through Yellowstone Pipeline to its terminus at Spokane, Washington. The pipeline was completed that year." (R. 1455; 9018-9019)
 
 "X
 
 35
 "National has sponsored and sold merchandise, including merchandise set forth in Exhibit `D' of the complaint, bearing labels, trademarks and/or trade names, the essential features of which are the words `CO-OP' and/or `National Cooperatives.' Customarily, National maintains product committees whose membership is composed of representatives from regional wholesale members who report to the board of National recommendations for manufacture and standards of products bearing the trademarks and trade names. National's `CO-OP' trademarked goods are distributed by its wholesale members to the local retail cooperatives. Both Pacific and FUCE have used the trademark `CO-OP' wherever each has done business. The trademark has been and is regularly used by the parties in two ways: One, it is affixed by or on behalf of National to products manufactured by or for National and made available by National to its members for distribution on the retail level. Two, it is used by members of National on products such as petroleum products which National does not make available." (R. 1455-1456; 9019-9020)
 
 
 36
 "XI
 
 
 37
 "The trademark `Universal' was adopted, used, and was registered in the Patent Office, Reg. No. 147,709, on October 25, 1921, by Universal Milking Machine Company. Pacific purchased and sold milking machine equipment manufactured under such registered trademark. Thereafter, in 194.., National purchased the Universal Milking Machine Company, its trademarks and the good will symbolized thereby and received due assignments thereof. It has used and maintained such registrations and has renewed and registered the trademark `Universal'. Pacific purchases and distributes milking machine equipment manufactured by National and bearing National's trademark `Universal' and the trade name `National Cooperatives.'" (R. 1456; 9021)
 
 
 38
 "XII
 
 
 39
 "National Cooperatives, Inc. and its predecessors in title have continuously used and maintained United States registration of the trademark `CO-OP' since 1924 and has used and maintained United States registration of the trademark `Universal' since 1921. National has caused the trademark `CO-OP' to be registered in its name in about 40 states, including Washington, Oregon and Idaho, as evidenced by Plaintiff's Exhibit 1." (R. 1456; 9021-9022)
 
 
 40
 "XIII
 
 
 41
 "The trademark `Capri' was adopted, used and registered by National in Class Thirty-One (31) for electric freezers, refrigerators and combination freezers and refrigerators, Reg. No. 663,131, on June 17, 1958; in Class Twenty-Four (24) for electric washers and dryers, Reg. No. 666,285, on August 28, 1959; and in Class Twenty-One (21) for electric water heaters, Reg. No. 688,223, on November 17, 1959." (R. 1456-1457; 9022)
 
 
 42
 "XIV
 
 
 43
 "National and National Cooperatives are part of the corporate name of National Cooperatives, Inc. and are not registered trademarks. Both Pacific and FUCE has used these words or trade names only in connection with goods, commodities or products supplied or sponsored by National or to evidence membership in National. The names `National' and `National Cooperatives' and the trademarks `Universal' and `Capri' have been affixed by or on behalf of National itself to the products made available to its members for sale by them at wholesale and have not been affixed by Pacific or FUCE themselves to any product. FUCE has never sold any `Capri' marked products." (R. 1457; 9022-9023)
 
 
 44
 "XV
 
 
 45
 "Mr. Charles Baker has been president of National since 1952 and a director since 1935. During this period he served as the general manager and secretary of Pacific and as one of its representatives on National's board." (R. 1457; 9023-9024)
 
 
 46
 "XVI
 
 
 47
 "Pacific has had in effect for many years membership agreements with many of its members which are similar in form and substance to that shown as Exhibit `B' to its complaint. Pacific since 1958 also has had in effect refinery agreements with a number of its members like that attached as Exhibit `C' to its complaint. The particular cooperatives with which Pacific has had signed contracts as shown by its records as of November, 1958, are set forth in Defendant FUCE Exhibit ......" (R. 1457; 9024)
 
 
 48
 "XVII
 
 
 49
 "Since their organization both FUCE and Pacific have loaned substantial sums of capital and have contributed managerial and numerous other services to their respective local cooperatives." (R. 1457; 9025)
 
 
 50
 "XVIII
 
 
 51
 "Both Pacific and FUCE have spent substantial amounts of money each year in advertising and promoting public acceptance of and the sale and distribution of goods, National and non-National, bearing the trademarks and trade names referred to herein in the respective areas where each has transacted business." (R. 1458; 9026)
 
 
 52
 "XIX
 
 
 53
 "There is no way for a customer of a local retail cooperative to distinguish goods bearing any of the trademarks or trade names referred to herein as having been supplied by or through Pacific or FUCE, unless the name of either organization is marked thereon. Neither the name of Pacific or FUCE is marked on any goods made available by or through National." (R. 1458; 9027)
 
 
 54
 "XX
 
 
 55
 "FUCE's first and only employee residing west of Montana has been one D.M. Johnson, residing at Seattle, Washington, who went on the payroll as a filed man January 1, 1957." (R. 1458; 9028)
 
 
 56
 "XXI
 
 
 57
 "Associated Cooperatives of Northern California, hereafter referred to as ACNC, became a regional wholesale member of National October 20, 1941. It has done and does business with local retail cooperatives in the Bay Area of California and has served local retail cooperatives as far north as Crescent City, California and Redding, California. Since 1951 ACNC has served no local retail cooperative north of Fort Bragg, California. Pacific has distribution facilities at Klamath Falls, Oregon and since 1940 has served local retail cooperatives at Tulelake and Alturas, California and prior to 1951 served one such unit at Crescent City, California. The local retail cooperatives of Pacific at Klamath Falls, Lakeview and Merrill, Oregon, have delivered, advertised and sold products bearing National's trademarks and trade names into the northeastern portion of California. ACNC does not handle Universal products. Universal Dairy Supply Corporation, hereafter referred to as UDSC, and its successor has sold Universal milking machines and accessories in the State of California for a period of years and to date, with patronage refunds to ACNC. Both Pacific and Consumers Cooperative Association, hereafter referred to as CCA, has supplied and now supply some products under National's trademarks and trade names to ACNC. Except as so stated here have been no sales of products under National's trademarks or trade names in the area comprising the northern half of California within the knowledge of the parties. The parties know of no evidence of conflicts, disputes or problems of competition between regional wholesale members of National in the area of the northern half of California." (R. 1458-1459; 9208-9210)
 
 
 58
 "XXII
 
 
 59
 "Utah Cooperative Association, hereafter referred to as UCA, became a wholesale regional member of National December 20, 1944. It has done and does business with local retail cooperatives in the State of Utah and eastern Nevada. Prior to the date UCA became a member of National, CCA had served local retail cooperatives of that association in Utah, and Pacific had served those of Pacific in northerly and westerly Utah. Pacific maintains a warehouse and distribution center at Pocatello, Idaho, and has delivered products under National's trademarks and trade names not handled by UCA to UCA and local retail cooperatives in Utah under special arrangement with UCA. Under similar arrangements, UCA and local retail cooperatives from northern Utah have obtained from Pocatello, Idaho, warehouse of Pacific products under National's trademarks and trade names not handled by UCA. UCA does not handle Universal products. Utah Poultry and Farmers Cooperative, and successor, hereafter referred to as UPFC, sells Universal milking machines and accessories in Utah, with patronage refunds to UCA. Except as so stated there have been no sales under National's trademarks or trade names in the State of Utah within the knowledge of the parties. The parties know of no evidence of conflicts, disputes or problems of competition between regional wholesale members of National in Utah." (R. 1459; 9208-9210)
 
 
 60
 "XXIII
 
 
 61
 "ACNC has supplied products under National's trademarks and trade names to local retail cooperatives in western Nevada and UCA to local retail cooperatives in eastern Nevada. Except as so stated there have been no sales under National's trademarks or trade names in the state of Nevada. The parties know of no evidence of conflicts, disputes or problems of competition between regional wholesale members of National in the state of Nevada." (R. 1460; 9208-9210)
 
 
 62
 "XXIV
 
 
 63
 "Regional wholesale cooperatives in Canada, members of National serving areas north of Washington, Idaho and Montana, have not introduced products into those states with National trademarks or trade names nor has Pacific or FUCE introduced any such goods into Canada. The parties know of no evidence of conflicts, disputes or problems of competition between wholesale regional members of National in Canada and those in Washington, Idaho and Montana." (R. 1460; 9208-9210)
 
 
 64
 "XXV
 
 
 65
 "The westernmost local retail cooperatives in Montana supplied by FUCE are located at Plains and Eureka, Montana, and the easternmost local retail cooperatives served by Pacific in Montana have been and are located at Kalispell and Ronan, Montana." (R. 1460; 9208-9210)
 
 
 66
 The following stipulated facts (says appellee National) are too extensive for quotation in full, but are fully set forth in the record:
 
 
 67
 (a) Relevant minutes of National (R. 742-794) including:
 
 
 68
 (1) Article X of by-laws of National adopted February 19, 1935 —
 
 
 69
 "Section 2. The name of the district wholesale may appear conspicuously on the border of the trade mark when used in connection with petroleum products sold in the territory covered by each regional wholesale, except the name of the district wholesale shall appear in connection with trade mark in all competing territory."
 
 
 70
 "Section 3. All members of the National Cooperatives, Inc. refrain from soliciting in any manner accounts doing business with another member of the National Cooperatives, Inc. or companies in process of organization by a member of the National Cooperatives, Inc. within the boundaries recognized by the National, as the territory of such members." (R. 750)
 
 
 71
 (2) Article I of by-laws of National, amended March 18, 1936, adding Section 3. (R. 752)
 
 
 72
 (3) Elimination of the foregoing by-laws by adoption of new by-laws of National December 20, 1944, including Article VIII:
 
 
 73
 "ARTICLE VIII
 
 
 "Trade Mark
 
 
 74
 "Section 1. Use by Members. The name of a district wholesale may appear conspicuously on the border of the trade mark when used in connection with petroleum products sold in the territory covered by each regional member, and shall appear where the trade mark is used in competing territory." (R. 769)
 
 
 75
 and, —
 
 
 76
 (4) Article IX of by-laws of National adopted September 8, 1946, (replacing former Article VIII) reading:
 
 
 77
 "ARTICLE IX
 
 
 78
 "TRADE MARK
 
 
 79
 "Section 1. Trade Mark. If a member individually uses the trade mark Co-op, it shall use its own corporate name conspicuously in connection therewith. The name `National Cooperatives, Inc.' in connection with the trade mark Co-op may be used only on those products distributed by this association directly or against a contract negotiated by this association." (R. 770)
 
 
 80
 (b) Relevant Minutes of FUCE (R. 795-827) and of Pacific (R. 828-866) are all stipulated.
 
 
 81
 (c) Trademark records (R. 919-934) (1709-3038) comprising stipulation that National "is the record owner" of Forty-Two (42) United States Trademark registrations including "CO-OP", "Capri", "Universal" and others, (R. 919-929) and as to those assigned,
 
 
 82
 "all right, title and interest in and to said marks, the registration thereof, and the good will of the business symbolized thereby"; (R. 929)
 
 
 83
 and the owner of State Trademark Registrations covering "CO-OP", including fifteen (15) Registrations in the states of Idaho, Oregon and Washington. (R. 930-932)
 
 
 84
 (d) Volume of sales by FUCE to local cooperatives in Montana, Wyoming, Idaho and Washington is shown by stipulation. (R. 867-910) It establishes that goods under National's trademarks have been sold by FUCE, in areas claimed by Pacific as exclusive (R. 4), and to local cooperatives claimed by Pacific as its exclusive members (R. 46-51), since 1939 in Montana (R. 883; 906); since 1943 in Wyoming (R. 868; 886); since 1943 in Idaho (R. 875; 876; 895; 896) and since 1955 in Washington (R. 874; 893).
 
 
 85
 Appellant has raised sixteen specifications of error, which have been reduced to seven in its summary of argument. They are:
 
 
 86
 I. The trial court abused its discretion in the pre-trial proceedings in entertaining the motion to dismiss.
 
 
 87
 II. The summary judgment was improper.
 
 
 88
 III. The trial court's dismissal of the third party complaint under Rule 41(b), Fed.R.Civ.P., was error.
 
 
 89
 IV. The judgment "abridges" Pacific's trademark property rights.
 
 
 90
 V. The judgment was error because National and FUCE are estopped from use of the trademarks "in Pacific's trade areas."
 
 
 91
 VI. The summary judgment erroneously eliminates the issue of unfair competition, pendent and nonpendent.
 
 
 92
 VII. Error in dismissing all claims against National and some against FUCE, despite material issues of fact.
 
 
 93
 Upon oral argument, it appeared to this court that appellant's position could best be narrowed down to the one question: Had Pacific acquired by any means an implied-in-fact exclusive license to use in the Pacific Northwest the trademarks registered to National?
 
 
 94
 While a "grant" of such an exclusive license was alleged, and that such grant had been later "confirmed," Pacific conceded in pretrial hearings, and on oral argument, that there is no formal agreement or contract containing any exclusive license with respect to the use of any trademark in favor of Pacific, unless it be by the Caldwell Agreement (R. 9030).
 
 
 95
 As stated in appellant's brief: "Pacific depends upon the usages, practices and customs of the parties to prove its exclusive rights and equitable ownership" in the alleged exclusive license.
 
 
 96
 We have carefully considered the so-called "Caldwell Agreement of April 14, 1941." We refer to appellant's brief, assuming it to be the strongest possible statement of appellant's position with respect to the meaning and legal effect of the Caldwell Agreement. It reads (p. 23):
 
 
 97
 "In 1939, Cooperative Oil Association (COA) of Caldwell, Idaho, a charter member of Pacific, withdrew from Pacific and sought membership in National. This application was refused by National, its minutes of September 8, 1939, reflecting:
 
 
 98
 "`Mr. Cort, (Midland) also reported that the Membership Application Committee had considered the application of COA at Caldwell, Idaho, for membership. He stated it was brought out in discussion that this organization had only recently withdrawn as a member of Pacific Supply Cooperative and it would be operating within the territory of Pacific Supply Cooperative, and stated for that reason the Committee denied the application * * *.' (R. 760)
 
 
 99
 COA sued Pacific and National claiming exclusive rights to use of the `CO-OP' trademark in the state of Idaho. Negotiations culminated in a settlement agreement referred to as the `Caldwell Agreement,' dated April 14, 1941. In the defense of the COA action, National and Pacific both represented that Pacific was then possessed of exclusive trademark rights within its trade area. (R. 1439-1444; 306-308; 1116-1126)."
 
 
 100
 What National and Pacific "represented" in the "Caldwell Agreement" is, of course, purely a conclusion of appellant. And what was pleaded or asserted in defense of a law suit does not necessarily become part of an agreement made in settlement of that law suit.[2] Appellee National quotes certain exact language taken from that "Caldwell Agreement." Paragraph 9 permitted COA to purchase through Pacific, at a markup, within Pacific's "territory," merchandise made available through National. COA agreed in return not to use the trademarks, "the essential feature of which consists of the word `CO-OP.'" In Paragraph 10 COA agreed not to sell gasoline and other petroleum products under the CO-OP trademark of an inferior quality, or "other than in territory of second party" (Pacific). COA in Paragraph 11 agreed not to solicit customers from Pacific's members, and vice versa. The pending litigation was dismissed "without prejudice," and in Paragraph 14 it was provided:
 
 
 101
 "It is further expressly agreed that neither the execution of this agreement nor any of the provisions thereof, nor the dismissal of either of the suits hereinbefore mentioned, shall be deemed or construed to be a waiver of, or prejudicial to, any of the rights that any of the parties hereto may now have to the use of trademarks, brands, names and labels, the essential feature of which is the word `CO-OP'." (R. 395)
 
 
 102
 We cannot read the Caldwell Agreement as appellant so readily does — as establishing "an exclusive trademark right within Pacific's trade area." In fact, it created and permitted two competing marketing organizations within the area Pacific now claims exclusively; permitting each to use the CO-OP trademark with certain restrictions on quality of products sold and solicitation of customers.
 
 
 103
 Early in 1941, Charles Baker, general manager and secretary of Pacific and a director of National (see note 2, supra), had filed an affidavit in the action out of which the Caldwell Agreement arose, which recited:
 
 
 104
 "that said National Cooperatives, Inc., has since the year 1933 licensed unto Pacific * * * the exclusive right to the use of the trademarks, brands, names and labels, the essential feature of which * * * consist of the word `CO-OP' in the territory which Pacific Supply Cooperative has operated and now is operating * * *." (Emphasis added.)
 
 Pacific also makes the statement that:
 
 105
 "National reconfirmed its policy and required CCA (sic) and Midland to recognize that each regional must respect the exclusive ownership of good will of the other regional members of the joint venture." (Br. p. 24. Emphasis added.)
 
 
 106
 The first reference to exclusive use of trademarks is clear. We do not understand this second statement with reference to good will, however, unless it is an attempt to prove (as appellant states later in its brief) that members of National were, in 1940, authorized to use the trademark in certain definite territories, and that National would undertake to prevent anyone else, members or nonmembers, from using it in that territory. To give Pacific the benefit of any doubt we assume this was stated by one Cowden, secretary of National, in 1940; and the same position was taken on several occasions by National prior to late in 1944.
 
 BY-LAWS
 
 107
 We next consider one of the important aspects of the case. In attempting to determine the understanding of the parties, we go to the content of the Articles of Incorporation and the By-Laws of the various corporations involved. The validity and value of this approach is recognized by all parties hereto.
 
 
 108
 On February 19, 1935, National adopted by-laws containing among other matters, as amended March 18, 1936, the Article X, Section 3, quoted at page 901, supra, which referred to "the territory of such members." (R. 750) On December 20, 1944, this Section 3 of Article X was eliminated by the adoption of new by-laws. Article VIII then read as quoted at page 901, supra, and referred to use of the trademark "in competing territory." (R. 769)
 
 
 109
 Article IX replaced Article VIII on September 8, 1946, and reads as follows:
 
 "ARTICLE IX[3]
 
 110
 "TRADE MARK
 
 
 111
 "Section 1. Trade Mark. If a member individually uses the trade mark Co-op, it shall use its own corporate name conspicuously in connection therewith. The name `National Cooperatives, Inc.' in connection with the trade mark Co-op may be used only on those products distributed by this association directly or against a contract negotiated by this association." (R. 770)
 
 CONDUCT
 
 112
 Pacific makes the flat statement "From 1934 to date National has required all parties in Pacific's trade territory seeking use of trademarked goods sponsored through National by the regionals to obtain them solely through Pacific." (R. 768; 1208; 339; 349) "The only breach of Pacific's said contractual rights and relations has been with reference to FUCE's recent violations." (R. 1056; 298-299; 383-385; 1053-B; 1066-1067)
 
 
 113
 Yet the volume of sales by FUCE to local cooperatives in Montana, Wyoming, Idaho and Washington is shown by stipulation (R. 867-910). (See "(d)" p. 901, supra.) These figures directly contradict appellant's flat statement.
 
 
 114
 The area claimed by Pacific includes each of the states mentioned in the stipulation. (R. 4) Thus, by the stipulated facts, Pacific's exclusive territory was not recognized by FUCE or National, since a time prior to the Caldwell Agreement.
 
 
 115
 Yet, says Pacific, FUCE for the first time came into Pacific's territory in 1954, and began taking away Pacific's customers, finally hiring away its longtime employee, Johnson.
 
 
 116
 On the aforesaid briefly described factual situation, somewhat contradictory in character, appellees' position is that the trial court correctly determined, solely as an issue of law, that National was the owner of all trademarks and trade names in issue; that Pacific is a licensee of National; as such licensee Pacific cannot acquire adverse rights against its licensor; that the rights of National are incontestable under the Lanham Act; that Pacific's rights in the trademarks and trade names of National are such as are granted by the Articles of Incorporation and By-Laws only — and that the Lanham Act controls, both on the issue of infringement and of Pendent Unfair Competition or Pendent Unfair Trading. (R. 1249)
 
 THE LANHAM ACT
 
 117
 Trademark Rights are not dependent on statutory enactment, but arise under common law from prior exclusive appropriation or adoption and use. Piggly Wiggly Corp. v. Saunders, 6 Cir., 1924, 1 F.2d 572.
 
 
 118
 The Trade Mark Act of 1905 did not change the common law rights in trademarks, but did add to those rights, and did protect them, not only for the benefit of the owners, but of the public. A trademark is an arbitrary symbol affixed by the manufacturer, or by one who has his products manufactured, to a vendible product, which designates and distinguishes such product and protects the manufacturer's good will, existing because of his business and the quality of his product.
 
 
 119
 But the 1905 Act required amendments (those in 1920 and 1938, substantial in nature) and in 1947 the Lanham Trade Mark Act became effective, after its adoption the previous year. Its purpose was not only to clear up inconsistencies and alleged "constructions" of prior acts which "obscured and perverted" their original purpose,[4] but to simplify practices, carry out international commitments, and to create new substantive rights in registration, and thus create an incentive to registration.
 
 
 120
 Among the new substantive rights recognized and created was the "collective mark" — a mark to be used by the members of a cooperative, association or other group to identify and distinguish the goods or sources of members.[5]
 
 
 121
 For the first time registration of a mark gave constructive notice to the world of the registrant's claim of ownership (15 U.S.C. § 1072), including those previously relying on an intrastate use only. Not only did the registration establish prima facie evidence of ownership, but likewise prima facie evidence of validity of the registration and of the registrant's exclusive right to use. After any five year use of a registered mark, it is incontestable if necessary affidavits are filed. (15 U.S.C. § 1065.) Marks renewed or registered under the old Act receive the procedural and remedial advantages of the new Act.
 
 
 122
 Collective marks (as are here involved) are provided for in 15 U.S.C. § 1054. Section 1055, which follows, reads:
 
 
 123
 "Where a * * * mark * * * is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant, * * * and such use shall not affect the validity of such mark or its registration, provided such mark is not used in such manner as to deceive the public."
 
 
 124
 "Related companies" is defined in 15 U.S.C. § 1127. And concurrent registration by more than one user was permitted. 15 U.S.C. § 1051.
 
 
 125
 It was stipulated here that the trademark "CO-OP" had been registered as a collective mark under the Lanham Act. (R. 919-934) It is admitted that the trademark CO-OP is incontestable under the Lanham Act (R. 272-273; 288; 1316). Under 15 U.S.C. § 1057(b) registrant's right to use is an "exclusive right to use * * * in commerce." Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., 8 Cir., 199 F.2d 407; Rolley, Inc. v. Younghusband, 9 Cir., 1953, 204 F.2d 209.
 
 
 126
 It is difficult to see, therefore, how any use by Pacific, a "related company" as defined by the Act, can do more than "inure to the benefit of the registrant" — National.
 
 ESTOPPEL
 
 127
 Entirely apart from the Lanham Act, estoppel in pais is raised by National against Pacific. Pacific represented to the United States Patent Office that the word "CO-OP" belonged to National. (R. 2880; 8890-8891; 9074.)
 
 
 128
 In Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, Inc., 5 Cir. 1935, 75 F.2d 13, the court said:
 
 
 129
 "There is a kind of evidential estoppel which, though it may not amount to a complete estoppel in pais, is raised when persons who have spoken or acted one way under one set of circumstances, and with one objective in mind, undertake under other circumstances and when their objective has changed, to testimonially give a different color to what they formerly said and did. We think that principle applies here." (At p. 17 of 75 F.2d)
 
 
 130
 To paraphrase the facts and opinion in the Holly Hill case, supra, and make the principle applicable here —
 
 
 131
 "Pacific cannot now say, `What I really intended you [National] to do was to have the trademarks issued in your name, and you were to have an "incontestable right" to use them as long as I was pleased with the manner in which you used them; as long as you didn't interfere with my exclusive use in such territory, as I think I should have exclusive use.' Pacific must say now what in effect it said, and enabled National to say, then." Pacific has pleaded it is a licensee of National. (R. 4, 5, 6, 7, 29, 32, 33, 34, 35, 37, 40, 94, 197, 199.) That National is the owner is pleaded (R. 460; 913); stipulated (R. 919-934); and admitted (R. 272-273; 287-288).
 
 
 132
 The right of Pacific, FUCE, and twenty-four other regional wholesale cooperatives arises from their membership in National. (Admitted Facts, Paras. IV, VI and VII.) That right is defined by the Articles of Incorporation and By-laws of National (supra).
 
 
 133
 The By-laws of National, as we have seen, grant non-exclusive and equal rights to all of National members, to use its trademarks anywhere. These By-laws were executed subsequent to the alleged "Caldwell Agreement" upon which Pacific primarily relies (R. 769, 770), and supersede it. Stevenot v. Norberg, 9 Cir. 1954, 210 F.2d 615. There the court said the change made by the stockholders in the By-laws
 
 
 134
 "was valid and effective. * * * The language of the amendment is clear, unequivocal, and unambiguous. No irregularity or fraud in its adoption is asserted. It cannot be held to have no force or effect, merely because of some mental reservation or unexpressed intention which the stockholders may have had when they adopted it." (Id. at 618.)
 
 
 135
 The above argument has assumed, as appellant urges, that the "Caldwell Agreement" creates an exclusive right to use the CO-OP trademark in Pacific. Yet by the agreement itself, Caldwell was permitted to use the trademark CO-OP on goods it could purchase from Pacific, and to use it on petroleum products, of a required standard, which were not made available by National. Thus the Caldwell Agreement created no express grant of an exclusive territorial right.
 
 
 136
 Where there is no express grant of exclusive territory in a contract or franchise, none will be impliedly read into the contract, as a general rule. Parkway Baking Co. v. Freihofer Baking Co., 3 Cir. 1958, 255 F.2d 641, 647. But the law recognizes exceptions.
 
 
 137
 As an expression of the exception to the general rule, Pacific relies heavily on Huber Baking Co. v. Stroehmann Bros. Co., 2 Cir. 1958, 252 F.2d 945. We think this reliance is misplaced.
 
 
 138
 Huber, in granting trademark rights to Quality Bakers Association (Hereafter QBA), reserved "full and unrestricted" trademark rights to the grantor in a designated area, i. e., where Huber had used the trademark and where Huber intended to use the trademark in the future. The right granted was in and to the use of an "enlarged" mark. This gave "rise to a valid and binding estoppel against QBA." Here National recognized no reservation of any rights in Pacific.
 
 
 139
 Judge Medina in the Huber case also held Huber was not estopped in his claim by his assignment to QBA. The license that Huber received back after its assignment was different than that given out by QBA to its other associates. The "Sunbeam" licensing contract with Huber contained three matters not in the other "Sunbeam" licenses —
 
 
 140
 (1) All other licenses specifically stated they were nonexclusive; Huber's did not.
 
 
 141
 (2) Huber retained the right to assign — the antithesis of an exclusive right in QBA.
 
 
 142
 (3) Huber claimed and obtained the exclusive right to use "Sunbeam" in the Philadelphia area, then only partly served by Huber, when Stroehmann "wanted in" on the Philadelphia area. QBA recognized this claim of right by refusing Stroehmann.
 
 
 143
 We contrast those facts to the factual situation here, where —
 
 
 144
 (1) the stipulated facts show (R. 867-910) that Pacific had competition from FUCE in areas originally or now claimed to be exclusively Pacific's, since 1939 in Montana (R. 883; 906); since 1943 in Wyoming (R. 868; 886); since 1943 in Idaho (R. 875-876; 893-896); since 1955 in Washington (R. 874-893); since 19.. in Utah, Nevada and California (R. 1458-1460; 9208-9210); and since 1959 in Oregon (R. 1140-1143; 75-88).
 
 
 145
 (2) that Pacific tried, unsuccessfully, to establish its exclusive rights to certain territory.
 
 We quote from appellee FUCE's brief:
 
 146
 "When National was reorganized as a Washington, D. C. corporation in 1944, Mr. Charles Baker participated as a member of Pacific in the formulation of its original trademark by-law (R. 769). He likewise participated in the adoption of an amended trademark by-law in 1946, which is currently in effect (R. 770).
 
 
 147
 "Mr. Baker served as General Manager and Secretary of Pacific since 1935 and as its representative on National's board during that period; he has been President of National since 1952 (R. 9023-9024; 1457).
 
 
 148
 "[There is then quoted a reference to the changes in By-laws, hereinabove discussed in detail earlier in this opinion.]
 
 
 149
 * * * * * *
 
 
 150
 "In the deposition of Mr. Baker, both he and Pacific's counsel admitted that this by-law accords to members of National the right to use its trademarks (R. 5778). Mr. Baker further admitted that competition has existed, principally in the Midwest, between a number of regional co-operatives, using the trademarks of National in the course of such competition `from the year one' (R. 5778-5779).
 
 
 151
 "On several occasions Mr. Baker has attempted to persuade the board of National to adopt procedures for the grant of exclusive territories, but such proposals have been rejected. (R. 5781, 5782; 773, 775, 776, 777-780; 781). On August 17, 1955 (R. 775), Mr. Baker made the following motion, which was subsequently tabled:
 
 
 152
 "`Moved by Mr. Baker, seconded by Mr. J. E. Rose, that the notice of the annual meeting inform members that the agenda will include consideration of a proposed by-law addition that it shall be the future policy of National Cooperatives, Inc., to grant franchises by geographical territories and by regional and local associations on the merchandise which it manufactures or purchases and distributes.' (R. 776) (Emphasis added)."
 
 
 153
 (3) Pacific first claimed exclusive territorial rights in seven western states. As we have seen, the proof showed competition from members of National in California, Utah, and Nevada. Pacific then claimed "exclusive rights" in Oregon, Washington, Idaho, Montana and Wyoming. The latter three were proved to have had competition from members of National for years, at least since 1943.
 
 Yet Pacific stated to the court:
 
 154
 "We contend there was no agreement for division of territory and we want to make that very definite that National nor the constituent members of National at no time arrived at any agreement for the division of the territory." (R. 8886) (Emphasis added.)
 
 
 155
 "The Court: Do I understand you to say you wanted to be understood there was no agreement for division of territory?
 
 
 156
 "Mr. Sherwood: That is true." (R. 8887)
 
 
 157
 Mr. Sherwood had explained that "the division of territories was created out of the users of this mark in the several localities creating the good will for each of these constituent members to the point where — in 1954 * * * we had valuable property rights." (R. 8886)
 
 
 158
 But in taking this position, appellant fails to recognize the long settled principle of law that a licensee (and Pacific had been that at least since 1944) of a trademark or trade name may not set up any adverse claim in it as against its licensor. Such use as a recognized licensee (pleaded and admitted by Pacific), sets up no rights in that licensee adverse to the terms of the license and the actual circumstances of the use. Hicks v. Anchor Packing Co., 3 Cir. 1926, 16 F.2d 723, 726; Medd v. Boyd Wagner, Inc., D.C., 1955, 132 F.Supp. 399; E. F. Prichard Co. v. Consumers Brewing Co., 6 Cir. 1943, 136 F.2d 512, 522, certiorari denied, 321 U.S. 763, 64 S.Ct. 486, 88 L. Ed. 1060.
 
 
 159
 (4) Appellant relies upon an alleged contract for exclusive use of trademarks allegedly existing over a period of years, and then a "revocation action" or "policy change" that denied the right to exclusive use, with alleged destructive effect on good will and business values generated by "long-time exclusive use of the marks." (Appellant's Br., p. 6.) Just what business result obtains under any license of a trademark, whether exclusive or nonexclusive, by an owner-licensor to a licensee — when the license expires by its terms or is terminated for other reasons? (A similar situation exists when any distribution or agency contract ends by its terms or is terminated for a variety of business reasons.) Such a termination with its resultant loss of business and profit does not create equitable rights in the licensee upon which recovery for such losses can be claimed or established; nor does it create any form of estoppel against the original licensor. Thus, while it must be admitted that Pacific claimed an exclusive right to use the trademarks, primarily through its officer, Baker, down through the years — that right was never recognized by any consistent course of conduct between the parties to this litigation — nor any unequivocal acknowledgement in writing by appellees that appellant's position was correct. The opposite occurred. Thus no exclusive right was created even impliedly, by the action of the parties.
 
 USE OF OTHER TRADEMARKS
 
 160
 There are other trademarks than CO-OP which are mentioned in the appellant's brief ("National," "National Cooperatives," "Capri" and "Universal"). Yet we agree with appellees that they have been stipulated out of the case.
 
 
 161
 It was stipulated the first two are part of the corporate name of National Cooperatives, Inc. and are not registered as trademarks (R. 9022-9023; 1457; Stipulated Fact XIV, supra.)
 
 
 162
 National purchased the trademark "Universal" in the 1940's, and registered it in its own name. (Stipulated Fact X, supra.) National registered "Capri" in 1958. Pacific, FUCE and the other cooperatives have used these names only on goods supplied and sponsored by National, or to evidence membership in National. (Stipulated Facts XII and XIV, supra.) It is stipulated they have never been affixed by Pacific or FUCE to any products. (R. 9022-9023; 1457.) Thus, technically, Pacific has never used these "trademarks," and the right to trademarks is founded, not on ownership, legal or equitable, but on use. 1 Nims, Unfair Competition and Trademarks 635, 636 (4th ed. 1947).
 
 PENDENT UNFAIR COMPETITION[6]
 
 163
 Section 1338, Title 28, United States Code, provides jurisdiction in the United States Courts "when joined with a substantial and related claim under * * * the trademark laws."
 
 
 164
 As nearly as we can tell from the briefs of appellant, the oral argument, and the representations made by appellant's counsel to the court below, the so-called issues of pendent unfair competition depend entirely upon the assertion of appellant Pacific that it has acquired an implied-in-fact exclusive license to use, in the Pacific northwest, the trademarks registered to National. The trial court having held, as a matter of law, that it has no such exclusive license, and we having held that this determination is correct, there is thus no support for the cause of action asserted under the label of pendent unfair competition.
 
 
 165
 We see nothing in Pursche v. Atlas Scraper, 9 Cir. 1961, 300 F.2d 467, nor in the Columbia Law Review note on Pendent Jurisdiction (62 Col.L.Rev. 1018 at 1048), that renders the trial court's position untenable.
 
 
 166
 Appellant simply did not establish its right to rely upon an implied-in-fact exclusive license to use National's trademarks existing by reason of the usages, practices and customs of the parties.
 
 PROCEDURE
 
 167
 In ruling as it did below, the trial court stated:
 
 
 168
 "* * * I think that after repeated pre-trial conferences and after repeated opportunities of the plaintiff to consider his third party complaint in light of the fact that a complaint such as that should contain the allegations with which the plaintiff expects to charge the third party defendant, that I should grant the motion of National to dismiss and I do so both granting the motion under 41(b) and the motion which is made August 15 and noted for argument day before yesterday in which they say:
 
 
 169
 "`That there has been no actionable wrongful inducement to cause member cooperatives of plaintiff to breach their membership contract and to dismiss all claims based upon such contention.'
 
 
 170
 and not as part of the pre-trial but as part of the motions and as part of the motions directed to the pleadings and as part of the motion, and partly on a motion for relief under 41(b). I feel that this matter has approached a phase that leads me to believe unless there is a definite limitation of issues and charges and counter charges, that this case will get far beyond any possible realm in which human endeavor can limit it, and so I feel that is necessary under the circumstances to do that and, accordingly, the motion is granted and National is dismissed." (R. 9609-9610.)
 
 
 171
 Appellee FUCE's motion to dismiss was denied under Rule 41(b) (R. 1244), and appellee FUCE was required to elect as to certain defenses. The motion of third party defendant to dismiss was granted under Rule 41(b) "as to the claims of Plaintiff based upon inducement to breach of contract, fraud, aiding and abetting and conspiracy," because of the inadequacy "to charge the Third Party Defendant with any claim on account thereof; * * * [that] there is no genuine issue of material fact thereon"; a partial summary judgment was granted "as to the issue of Exclusiveness and the related issues of Trademark Infringement and Pendent Unfair Competition." Defendant National was decreed the owner of the trademarks and trade names; the plaintiff Pacific was adjudicated a licensee of National.
 
 
 172
 "* * * The Court determines and adjudicates: the Third Party Defendant is the owner of all trademarks and trade names in issue; Plaintiff is a licensee of Third Party Defendant; as such a licensee Plaintiff cannot acquire adverse rights against its licensor; the rights of Third Party Defendant are incontestable under the Lanham Act; Plaintiff has only such rights in trademarks and trade names of the Third Party Defendant as are granted by the Articles and By-Laws of Third Party Defendant which grant to all members of Third Party Defendant equal and non-exclusive rights; Plaintiff has failed to produce or show in the course of pretrial proceedings any matter which would vary or change non-exclusive rights or raise any genuine issue of material facts thereon; the issues of Trademark and Trade name Infringement and Pendent Unfair Competition or Pendent Unfair Trading, are governed by the Lanham Act.
 
 
 173
 "(3) The Court specifically finds and determines that judgment should be entered immediately as to one or more, but fewer than all, of the claims or parties and that there is no just reason for delay; further, that there is no genuine issue of material fact as to any of the matters covered by such judgment. The Court accordingly directs entry of final judgment and does hereby enter judgment as follows:
 
 
 174
 "IT IS ORDERED AND ADJUDGED that the Third Party Complaint be and the same is hereby dismissed with prejudice * * *." (R. 1249)
 
 
 175
 We find no error in such ruling in the record before us, for the reasons heretofore stated. We hold the pre-trial hearings were properly terminated; that in striking Pacific's request for "Admission and Genuineness of Documents and to Admit Exhibits Into Evidence" (clearly filed in violation of the trial court's orders) the trial court acted properly.
 
 
 176
 We affirm the judgment below, both as to the defendant FUCE and the third party defendant National.
 
 
 
 Notes:
 
 
 [1]
 "1121Same; jurisdiction of Federal courts
 "The district and territorial courts of the United States shall have original jurisdiction, the circuit courts of appeal of the United States and the United States Court of Appeals for the District of Columbia shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties."
 
 
 [2]
 Purely as an example, we have carefully studied the references cited by appellant and relied upon by it in support of its statement that"National and Pacific both represented that Pacific was then possessed of exclusive trademark rights within its trade area." (Appellant's Br., p. 23. Emphasis added.)
 Three references to the Transcript are made. They are:
 (a) Tr. 1439-1444.
 This is a reference to the "Statement of Plaintiff [Pacific] relative to Exclusive Rights of User." (Emphasis added.)
 (1) The first reference on page 1439 is to Pacific's By-Laws which contains no apt reference to our problem.
 (2) The next is to Pacific's "Membership Agreement." Before quoting the latter, this self-serving statement appears: "The agreement was designed to protect National as well as Pacific in the latter's exclusive rights within its trade area."
 (3) The statement then quotes from page 4 of its own Membership Agreement to show Pacific has the exclusive right to represent National in the territory served by Pacific; that National is the owner of certain trademarks, that the use of such trademarks (including CO-OP) is by license from Pacific, and is terminable by the terms of the agreement. Thus, there is no reference to any agreement by National that Pacific had exclusive trademark rights.
 (4) Pacific's statement then quotes certain allegations from its own complaint in intervention in the Caldwell litigation, referring to what Pacific's local units "intended" to do to protect its exclusive use (Tr. 1441).
 (5) Pacific then makes the self-serving references to its own pleadings.
 (6) Pacific then refers to affidavits filed by it, signed by Charles Baker, its officer, referring to its alleged exclusive right to use the trademarks involved (Tr. 1443-1444).
 (b) Tr. 306-308.
 (1) These pages refers to the affidavit of Charles Baker (which states Pacific had the exclusive right, by license from the owner National, of the trademark "CO-OP"), which was filed in Idaho state (so-called Caldwell) litigation. He made this affidavit as a director of National Cooperatives, Inc., and also as manager and secretary of Pacific.
 (c) Tr. 1116-1126.
 This refers to "Plaintiff's Request for Admission of Facts and Genuineness of Documents and to Admit Exhibits into Evidence," filed August 7, 1961, covering 110 pages. Nothing of interest appears until:
 (1) Item 3010, Transcript, p. 1119, which is a reference to Charles Baker's affidavit that Pacific had an exclusive right to the use of the trademark CO-OP (as previously mentioned in (b) supra);
 (2) Item 3031, Transcript, p. 1122, which recites the Board of Directors of Pacific "was of the opinion it was better to make a poor compromise than to win the law suit. * * * We have done everything possible to safeguard the CO-OP trademark for Pacific Supply Cooperative and the National."
 (3) Item 303-g, Transcript, p. 1124, which refers to an effort to straighten out the trademark matters in the territory served "* * * [so] that Pacific and National have the right to claim the exclusive right (sic) to use `CO-OP' brands, etc., in this territory."
 (4) Item 303-l, Transcript, p. 1125, which refers to correspondence indicating that Pacific's "greatest difficulty in the litigation drew (sic) out of our efforts to settle the matter involving trademarks. * * * We were not in an admirable position respecting the same. * * * We were ultimately successful in maneuvering the negotiations so as to obtain at least a year's recognition of the trademark as belonging to National and its licensee regional Pacific Supply."
 (5) Item 305-a, Transcript, p. 1126, which was material to prove that on November 5, 1953, before any controversy had arisen between Pacific and FUCE, Pacific interpreted the Caldwell Agreement as follows: "The contract also recognizes PAC as exclusive licensee of those trademarks," under agreement with National, in Montana, Idaho, Washington, Oregon, Northern California, Alaska and Wyoming.
 Thus, we cannot agree with counsel for appellant that "In the defense of the COA action, both Pacific and National represented that Pacific was then possessed of exclusive trademark rights within its trade area." (Emphasis added.) The only support for such a statement is the allegation to that effect made by Charles Baker, a person wearing two hats, to say the least.
 We cannot leave the subject of flat statements, made as arguments in appellant's brief, but lacking in adequate cited support, without reference to another example:
 Appellant states: "While the court relied on `stipulations' `agreed statements' and `admissions' (R. 1247), Pacific repeatedly advised the court of their inaccuracy by reason of incompleteness (e. g., R. 9325-9326)." We think one citation is inadequate to establish a repeated course of conduct. On page 9325, Mr. Sherwood stated he contended that stipulations made by dictation into the record were not a part of the record "until we complete the stipulations." The trial court, and we think with reason, felt that the stipulations were complete when made, and competent to establish sufficient facts to create issues of law based on such determined facts.
 
 
 [3]
 This section is called "Article X" in appellant's brief (p. 27)
 
 
 [4]
 Cf.: Commentary on Lanham Act, 15 U.S.C., page 205 et seq
 
 
 [5]
 Collective marks were actually created by amendment in 1938, but were not adequately defined, and little used
 
 
 [6]
 Referred to in appellant's brief as "Unfair Trading."