**SEVEN–UP BOTTLING COMPANY, etc., Appellant,**

**v.**

**The SEVEN–UP COMPANY, etc., and Seven-Up Services Incorporated, etc., Appellees.**

No. 76–1909.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1977.

Decided July 26, 1977.

Rehearing and Rehearing En Banc Denied Sept. 20, 1977.

John H. Stroh, St. Louis, Mo., argued and filed brief, for appellant.

Thomas C. Walsh, St. Louis, Mo. (argued), and Veryl L. Riddle and Lee H. Wagman, St. Louis, Mo., on brief, for appellees.

Before BRIGHT and HENLEY, Circuit Judges, and BENSON, Chief District Judge.*

BRIGHT, Circuit Judge.

Seven-Up Bottling Co. (Bottling), a local bottler and distributor of soft drinks in St. Louis, Missouri, brought this action against Seven-Up Company (Company) and Seven-Up Services, Inc. (Services), a wholly-owned subsidiary of the Company, alleging various claims under the Trademark Act of 1946 (Lanham Act), 15 U.S.C. §§ 1051–1127, and a pendent state law claim for unfair competition. Subject matter jurisdiction was based upon 28 U.S.C. § 1338. On defendants' motion to dismiss, the district court [1] determined that Bottling's trademark claims all amounted to attempts by a trademark licensee to question its licensor's title to the licensor's marks and hence were barred by the rule of licensee estoppel, and

---

* PAUL BENSON, Chief District Judge, District of North Dakota, sitting by designation.

1. Hon. Roy W. Harper, United States Senior District Judge for the Eastern District of Missouri.

concluded further that in the exercise of discretion the pendent state law claim should be dismissed. *Seven-Up Bottling Co. v. Seven-Up Co.*, 420 F.Supp. 1246 (E.D. Mo.1976). Bottling appeals. We affirm.

The facts are fully recounted in the district court's opinion. We restate, however, the facts most relevant to this appeal. Since 1929, appellee Company has sold extracts used in flavoring soft drinks and appellant Bottling has purchased the extracts from the Company, and bottled and locally distributed a soft drink made with the extract under the trademark "Seven-Up." Appellee Services was formed in 1957 to aid distributors in production and marketing of Seven-Up.

The Company secured registrations of the trademarks "Seven-Up" and "7-Up" in 1929 and 1936, for soft drinks and the syrups and extracts used in their production. From 1929 until 1939, the Company dealt with its distributors on an informal basis, with no written distributorship agreements. In 1938, this practice ended with the initiation of a franchising policy. The Company granted franchises to local bottlers who would purchase flavor extract from the Company for production and sale of soft drinks under the trademark "Seven-Up." The Company itself did not produce finished soft drinks. Franchisees were assigned territories with "the exclusive rights within said territories to prepare such soft drinks according to the formula of Company in packages bearing the trademark 'Seven-Up'." Bottling is a party to two such agreements for territories in Missouri and Illinois, dated January 24, 1939 and January 25, 1939. These agreements contain no express term of duration.

Before 1943, the Company's licensees, such as Bottling, advertised "Seven-Up" individually in their own territories. During 1943, a national media campaign was organized by a number of licensees, including Bottling. Each licensee contributed $17.50 per gallon of flavor extract purchased from the Company to a fund administered by the Company as trustee. The Company made no contributions to this fund, but used the fund to purchase national media advertising to develop the good will of itself and its developers. This advertising fund terminated in 1950.

During 1942 and 1943, the Company applied to register the trademark "Seven-Up" along with accompanying drawings as a "collective" mark for soft drinks showing the collective mark as used on the goods "by persons duly authorized by" the Company. Those applications state that the "collective" mark was used since 1928 by persons authorized by the Company to show the Company as the single source of "extracts or other ingredients used in compounding the beverage."

Between 1954 and 1966, the Company obtained six additional registrations showing "7-Up" in various contexts, which made claims similar to those in the 1929 and 1936 registrations. There is presently an application pending for another such registration.

In 1956, Bottling and the Company entered an agreement regarding the manufacture, promotion, and sale of "pre-mix" Seven-Up.[2] Bottling expended a large amount of money to develop the pre-mix business.

Since 1961, Bottling has manufactured and sold "post-mix" or soda fountain syrup "Seven-Up." In 1961, Bottling was offered a contract by Company covering the promotion and sale of the syrup but which would have reserved to the Company the right to make and sell syrup in Bottling's territory or to designate others to do so. Bottling rejected this offer, contending that the attempted reservation of rights would permit the Company to compete unfairly with Bottling, and would infringe beneficial rights to exclusive use of "Seven-Up" trademarks which Bottling claimed under the "collective" trademark registrations of 1942 and 1943. Accordingly, Bottling purchased syrup from Services until later in 1961 when

---

**2.** "Pre-mix" soft drink is finished soft drink typically sold in paper or plastic cups from coin vending machines, whereas "post-mix" refers to "fountain syrup" which is mixed with carbonated water at the point of distribution to the consumer.

the parties negotiated a contract with language which Bottling claims protects its exclusive right to produce and distribute "Seven-Up" in its territory.

In 1958, Company and Services arranged for "Seven-Up" to be produced in cans. Bottling began to purchase canned "Seven-Up" from Services in 1959. These purchases continued on an informal basis until January 1968, when Bottling and the Company executed a written contract allowing Bottling to purchase "Seven-Up" in cans from sources designated by the Company as "approved packagers." More recently, the Company required Bottling to purchase "Seven-Up" in cans from Services, at prices usually higher than those of "approved packagers." Bottling sought permission from the Company to can and distribute "Seven-Up" in its territory, but in 1974 the Company refused this request except on condition that Bottling (1) agree that the Company reserves the right to manufacture finished "Seven-Up" soft drink in Bottling's territory; (2) surrender its 1939 contract with the Company; and (3) accept a new contract with a limited term of years. Company insisted on similar conditions before it would allow Bottling to package "Seven-Up" in plastic containers. This action followed.

Bottling contends, basically, that the Company never actually manufactured soft drinks or syrups before 1929 or 1936 and that the registrations of those years were therefore procured through fraud on the patent office and are invalid and void. Bottling further contends that the "collective" marks registered in 1942 and 1943 are valid and prevent the Company and Services from using the trademark "Seven-Up" on any form of finished soft drinks or syrups, because these registrations reflect use of the marks on finished soft drinks by a collective group of authorized persons (Company's licensees, including Bottling) rather than Company or Services itself. Bottling further contends that all registrations secured after 1943 are invalid for the same reasons as the 1929 and 1936 registrations, and also because they are inconsistent with the "collective" registrations.

Bottling claims that the Company and Services have attempted to compete unfairly with Bottling through appropriation of Bottling's good will and infringement upon Bottling's rights under the collective marks, and asks the court to grant (1) an injunction against the Company and Services prohibiting them from manufacturing or selling syrup or soft drink under the name "Seven-Up" in Bottling's territory; (2) an order prohibiting the Company from competing in any manner in Bottling's territory with regard to "Seven-Up"; (3) an order directing the Company and Services to recognize Bottling's right to can "Seven-Up" in its designated territory; and (4) cancellation of all the Company's trademarks except the 1942 and 1943 "collective" registrations, as well as denial of the currently pending registration application.

Bottling's trademark claims hinge on its contention that the 1939 agreements between the parties were exclusive licenses to use within a specific territory "collective" trademarks owned by the Company and subsequently registered in 1942 and 1943. See 15 U.S.C. § 1127. The Court of Appeals for the Second Circuit has described such marks as follows:

A collective mark is owned, and may be registered, by the group or association of which it is a symbol, but not by a user thereof, and it indicates to the public that members of the association produced the merchandise bearing the mark. The association which owns the mark may not use it on merchandise, if it produces any, as may its members. Since the common law required affixation and user for the acquisition of a trademark it is clear that there would be no basis in that law for a collective mark, and indeed such marks were denied registration under the Trade-Mark Act of 1905. However, a 1938 amendment to the Act of 1905 provided for the registration of collective marks and the Lanham Act included a similar provision. [*Huber Baking Company v. Stroehmann Brothers Company*, 252 F.2d 945, 952 (2d Cir.), *cert. denied*,

358 U.S. 829, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958) (footnotes omitted).]

As the passage from *Huber Baking* indicates, if Bottling's construction of the agreements between the parties as exclusive licenses of collective trademarks is correct, the Company would be prohibited from using the marks on finished soft drinks in. competition with Bottling, and Bottling would have the exclusive right to use the marks within its territory on any form of finished soft drink. *See also Pacific Supply Cooperative v. Farmers Union Central Exchange, Inc.*, 318 F.2d 894, 906–09 (9th Cir. 1963), *cert. denied*, 375 U.S. 965, 84 S.Ct. 483, 11 L.Ed.2d 414 (1964).[3]

The district court held that Bottling's admitted status as a trademark licensee of the Company estops Bottling from claiming the exclusive right to use the Seven-Up trademarks for all forms of finished soft drinks in its territory:

> In plaintiff Bottling's Memorandum in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint (hereinafter cited as "Memo in Opposition"), at page 1, it is stated:
>
> "At the very outset, plaintiff wishes to make it clear to the Court and to defendant that it:
>
> "1. Does. not claim title to, or ownership of the mark 'Seven-Up' or '7-Up' for soft drinks and syrups for making the same.
>
> "2. Does not question the validity of the mark, 'Seven-Up' or '7-Up'.

"3. Does not question Defendant, The Seven-Up Company's ownership of the mark 'Seven-Up' or '7-Up' as used on flavor extracts.

"4. Does not question Defendant, The Seven-Up Company's ownership of the collective trademark 'Seven-Up' or '7-Up' as used on soft drinks and syrups for making the same.

"5. Does not question the validity of the license agreement between Plaintiff and Defendant."

\* \* \* \* \* \*

The establishment of an existing licensor-licensee relationship between Company and Bottling effectively constitutes an insuperable bar to recovery by Bottling with regard to its trademark claims. Under the doctrine of licensee estoppel a plaintiff-licensee is estopped from contesting the validity of its licensor's marks. *Heaton Distributing Co. v. Union Tank Car. Co.*, 387 F.2d 477, 482 (8th Cir. 1967); III Callman, Unfair Competition, Trademarks and Monopolies, § 78.02, at 454 (3rd Ed. 1970). \* \* \*

In the instant case, plaintiff by judicial admission has established the existence of a present and valid licensing agreement between plaintiff and defendant. Thus becomes operative that "long settled principle of law that a licensee of a trademark or tradename may not set up any adverse claim in it as against its licensor." *Pacific Supply Cooperative v. Farmers Union Central Exchange*, 318

---

**3.** Company and Services contend that the 1942 and 1943 registrations were of "related company" marks. "Related company" is now defined in 15 U.S.C. § 1127:

> The term "related company" means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect of the nature and quality of the goods or services in connection with which the mark is used.

The effect of a related company's use of a mark is set out in 15 U.S.C. § 1055:

> [S]uch use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration[.]

Company submits that it exercised the requisite degree of control over Bottling's Seven-Up production, but Bottling asserts that there was no supervision at all.

The Act of June 10, 1938, 52 Stat. 639, first authorized registration of collective marks, but the term "collective mark" remained undefined until the passage of the Lanham Act of 1946. Appellees concede that the 1942 and 1943 registrations referred to "collective marks," but assert that most marks registered as collective marks between 1938 and 1946, including the 1942 and 1943 "Seven-Up" registrations, do not meet the Lanham Act's definition of a collective mark, and that the Company's use of the term "collective mark" in the 1942 and 1943 registrations cannot evidence an intent to register a type of mark first defined three years later in the Lanham Act of 1946.

F.2d 894, 908–9 (9th Cir. 1963), cert. denied, 375 U.S. 965, 84 S.Ct. 483, 11 L.Ed.2d 414 (1964). Plaintiff Bottling seeks cancellation of seven trademark registrations (those of 1929, 1936, 1954, 1956, 1957, 1959 and 1966) and the refusal of the trademark application of 1975 on the grounds that such are "invalid, void and of no effect" as having been fraudulently obtained or requested on the basis of materially false and fraudulent statements. The two trademark registrations of 1966 and the trademark application of 1975 are sought to be cancelled for alleged inconsistency with previously registered "collective" marks. Such alleged invalidity for false and fraudulent registration statements and inconsistency with other marks as well as the plaintiff's prayer for cancellation leave little doubt but that licensor-Company's title to the marks represented by those registrations is being attacked by its licensee. Accordingly, the licensee, Bottling, is estopped to deny the validity of those trademarks.

\* \* \* \* \* \*

Plaintiff proposes that registration of the "collective" marks of 1943, 1944 and 1945 had and continues to have two distinct effects. First, it vests in plaintiff and to other "Seven-Up" developers similarly situated exclusive rights to the use of the trademark "Seven-Up" on soft drinks and syrups. Second, it vests in Company, as registrant of the marks, ownership of the marks. According to well-settled trademark law, such an argument constitutes an indirect attack on the validity of the Company's title to trademarks it obtained both before and after registration of the collective marks of the 1940's. By asserting Company is the owner of collective marks, Bottling attacks Company's right to use of the marks.

\* \* \* \* \* \*

In effect, Bottling's attempt to uphold the marks of 1943, 1944 and 1945 as collective marks challenges those trademarks of Company covered by registrations stating Company's use of the mark on various goods. It is an indirect attack by a licensee on its licensor's title to marks and it will be no more tolerated by the doctrine of licensee estoppel than a direct attack on those marks. [*Seven-Up Bottling Co. v. Seven-Up Co.*, 420 F.Supp. 1246, 1251–52, 1253 (1976).]

Bottling argues that a licensee is not estopped to challenge its licensor's claims to a mark unless the licensee's position is inconsistent with the license, citing 3 R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies* § 78.2, at 454 (3d ed. 1969). If the 1939 agreements were licenses of collective marks subsequently registered in 1942 and 1943, Bottling contends that its claimed beneficial right to use those marks within its territory, to the exclusion of the Company and Services, is not inconsistent with its licenses and Bottling cannot be estopped from raising those claims. Given Bottling's view of the case, Bottling's challenges to the Company's registrations of 1929, 1936, 1954, 1956, 1957, 1959, and 1966 do not create an estoppel because the license agreements between the parties did not license the allegedly invalid marks covered by those registrations, and Bottling did not acknowledge their validity when it took a license of the collective mark in 1939.

Bottling's position might have some merit if the 1939 agreements were the only such contracts entered into by these parties. Although the parties agree that those agreements created a trademark licensor-licensee relationship, these agreements are silent as to the precise nature of the trademark rights included in the license. Later licensing agreements between the parties, however, make clear the parties' understanding that the Company retained the right to manufacture and distribute the Seven-Up products which Bottling was licensed to produce, such as soft drinks and syrups, and that Bottling did not have the sole right to that use of the mark within its territory. Therefore, Bottling cannot now claim that it has the rights which flow from an exclusive territory license of a collective mark.

For example, the contracts of September 22, 1961, and May 4, 1970, which licensed Bottling to manufacture post-mix Seven-Up syrup, both contain identical provisions, which read as follows:

WHEREAS, the Seven-Up Company has always retained, for itself the exclusive privilege of manufacturing, selling and distributing Post-Mix 7-Up syrup, and

\* \* \* \* \* \*

WHEREAS, it has been the policy of The Seven-Up Company to let the licensed bottlers of 7-Up handle the Pre-Mix 7-Up business in addition to the 7-Up bottling business, The Seven-Up Company now desires to extend this policy by offering a license to you for the manufacture, sale and distribution of Post-Mix 7-Up syrup in the territory for which you have 7-Up bottling privileges, and

WHEREAS, The Seven-Up Company still desires to reserve and retain for itself and any subsidiary of it the right to manufacture, sell and/or distribute Post-Mix 7-Up syrup in any territory, including the right to contract for or to arrange with other persons, firms and/or organizations to perform any and/or all of these functions, when in its judgment alone it is desirable, including but not limited to situations where the bottler is not interested at all, or situations where the bottler cannot or will not cooperate in handling business developed by The Seven-Up Company through concessionaires, or other organizations which may or may not operate in more than one bottler's territory.

\* \* \* \* \* \*

1. Company licenses to Manufacturer and agrees to license no other Post-Mix manufacturer the right to manufacture, sell and distribute Post-Mix 7-Up syrup for use in post-mix vending and dispensing equipment within the same territory in which Manufacturer is licensed to bottle 7-Up subject to the reservation that Company reserves for itself and any subsidiary of it the rights to manufacture, sell and/or distribute Post-Mix 7-Up syrup anywhere

when in its judgment alone it is desirable to do so and it is further agreed that such reserved rights include the right to contract for or to arrange with other persons, firms and/or organizations to perform any or all of these functions.

\* \* \* \* \* \*

Thus, Company reserved to itself the right to manufacture and distribute within Bottling's territory a Seven-Up product which Bottling was licensed to produce. The reservation forms a part of the licensor-licensee relationship between Company and Bottling. Bottling also has purchased canned "Seven-Up" from the Company or services at various times since 1959, implicitly recognizing their right to sell Seven-Up. Bottling's agreements and course of conduct are incompatible with Bottling's claim that the relationship between itself and the Company is a license of a collective trademark, because the licensor-owner of a collective mark may not make or sell trademarked goods. *See* 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 68.3, at 85–86 (3d ed. 1969).

■ Beyond its contention that the marks licensed to it are collective marks, Bottling offers no reason why it should not be estopped from making claims to the "Seven-Up" trademarks adverse to the Company. The district court properly dismissed Bottling's trademark claims.

■ Because the district court properly dismissed Bottling's trademark claims before trial for failure to state a claim upon which relief could be granted, the district court did not abuse its discretion in dismissing Bottling's pendent state law unfair competition claim. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *American Foresight of Philadelphia, Inc. v. Fine Arts Sterling Silver, Inc.*, 268 F.Supp. 656 (E.D.Pa.1967); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3582, at 558 (1975).

Affirmed.

## ORDER ON PETITION FOR REHEARING

Appellant reads our prior opinion in this case as rejecting the estoppel theory of the district court, but affirming the court's dismissal of the complaint by ruling on a disputed matter of fact, *i.e.*, that other agreements spelling out the relationship of the parties justified the dismissal on estoppel grounds. Therefore, appellant seeks a rehearing, arguing that because its complaint was dismissed under Fed.R.Civ.P. 12(b)(6), for failure to state a claim on which relief can be granted, it was improper for this court to make a factual determination based on extrinsic evidence. Appellant concludes that "[i]n its review, the panel acted as a trial court, and is subject to the same standards in its determination of the motion to dismiss." Appellant then correctly notes that the standard is a rigorous one: No claim may be dismissed under Rule 12(b)(6) for failure to state a claim unless it appears beyond doubt that plaintiff cannot obtain any relief.

While appellant correctly states existing law, it misreads our opinion. Based on a complete reading of the pleadings including the agreements attached to appellant's brief, construed in a light most favorable to appellants, this court is of the opinion that appellant could not possibly prevail. The pleadings conclusively establish that appellant's "collective mark" argument must be rejected and support the district court's dismissal of the case for failure to state a claim.

We deny the petition for rehearing and the suggestion for rehearing *en banc*.