# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2281

_____

Fair Isaac Corporation;                  *
myFICO Consumer Services, Inc.,          *
                                         *
      Plaintiffs/Appellants,       *
                                         *
    v.                                 *
                                         *
Experian Information Solutions, Inc.;    *
VantageScore Solutions, LLC;             *
Does I through V,                        *
                                         *
      Defendants/Appellees.        *

_____

No. 10-2409

_____

Appeals from the United States
District Court for the
District of Minnesota.

Fair Isaac Corporation;                  *
myFICO Consumer Services, Inc.,          *
                                         *
      Plaintiffs/Appellees,        *
                                         *
    v.                                 *
                                         *
Experian Information Solutions, Inc.;    *
VantageScore Solutions, LLC,             *
                                         *
      Defendants/Appellants,       *
                                         *
                                         *

_____

Submitted: May 12, 2011
Filed: August 17, 2011
_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Fair Isaac Corporation and myFICO Consumer Services, Inc. (FICO) brought suit against three credit bureaus: Experian Information Solutions, Inc. (Experian), Equifax, Inc. (Equifax), and Trans Union LLC (TransUnion), as well as against VantageScore Solutions, LLC (VantageScore), the credit bureaus' joint venture.[1] The suit alleged antitrust, trademark infringement, false-advertising and other claims. FICO appeals from the district court's[2] grant of summary judgment dismissing FICO's antitrust and false-advertising claims and its ruling that FICO's registered trademark was merely descriptive. FICO also appeals from the judgment entered on the jury verdict that it had obtained its trademark registration through fraud on the United States Patent and Trademark Office (PTO). Experian and VantageScore appeal from the district court's denial of their post-trial motion for attorneys' fees. We affirm.

## I. Background

FICO was the first company to develop sophisticated algorithms for generating credit scores that characterized consumer financial creditworthiness. FICO credit scores are composed of aggregated credit data, provided by a credit bureau, and a

_____

[1]FICO ultimately reached a settlement with Equifax and TransUnion.

[2]The Honorable Ann D. Montgomery, United States District Court Judge for the District of Minnesota.

credit-scoring algorithm provided by FICO. FICO's credit score is the most widely used score in the industry. Experian, Equifax, and TransUnion aggregate and sell consumer credit data that shows consumer debt-paying history. FICO's credit scores are referred to as "tri-bureau" because regardless of which credit bureau data is used, the scores are "highly consistent and predictive." This result is accomplished through algorithms based on each credit bureau's aggregated data, which account for data differences and produce credit scores that fall within a credit-score range of 300-850. In 2004, FICO applied for trademark registration for "300-850," which was later issued. The credit bureaus have developed their own credit scores, based only on their data, which are therefore less desirable to lenders.

The credit bureaus began meeting to develop a joint venture for the purpose of creating a tri-bureau credit score algorithm that could compete with FICO and reduce the amount the credit bureaus paid as royalty for using FICO's algorithms. They ultimately introduced VantageScore in March 2006. The VantageScore credit-score algorithm was created using data common to the three bureaus. The algorithm is licensed to each bureau for a flat monthly royalty. The credit bureaus reduced the price of VantageScore credit scores to entice "key" lenders to adopt the new scores, which the credit bureaus hoped would create momentum in the industry for others to follow.

FICO filed this suit in October 2006. The district court dismissed FICO's antitrust and false-advertising claims. It also determined that FICO's registered trademark, "300-850," was merely descriptive and found that a genuine issue of material fact existed regarding whether the mark had acquired secondary meaning. The credit bureaus and VantageScore counterclaimed, asserting that FICO had procured its trademark registration by fraud. A jury determined that FICO's mark had not acquired secondary meaning and was therefore invalid. It also found that FICO had procured the registration through fraud on the PTO. The district court denied Experian and VantageScore's post-trial motion for attorneys' fees.

## II.  Analysis

### A.  Antitrust

We review *de novo* the district court's grant of summary judgment dismissing FICO's antitrust claims and view the evidence in the light most favorable to FICO. Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 422 (8th Cir. 2009).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material facts are those which might affect the outcome of the lawsuit. A dispute over an issue of fact is 'genuine' if there is sufficient evidence to allow a reasonable jury to find for the non-moving party on that issue."  Marksmeier v. Davie, 622 F.3d 896, 899-900 (8th Cir. 2010).

FICO's antitrust claims against Experian and VantageScore sought damages and injunctive relief.  FICO asserts that the district court failed to consider the merits of its antitrust claims, did not view the evidence in the light most favorable to it, and committed reversible error by determining that FICO had not suffered antitrust injury and lacked standing to pursue the claims.  FICO asserts that it has suffered two antitrust injuries:  (1) in the credit-scoring market, it was the specific target of the credit bureaus' unlawful conspiracy, and (2) in the market for aggregated credit data, as a customer of the credit bureaus' data, the conspiracy resulted in reduced data quality.

"A private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing 'injury causally linked to an illegal presence in the market.'"  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990).  Instead, "a private plaintiff must demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants, and that he has standing to pursue a claim under the

-4-

federal antitrust laws." In re Canadian Import Antitrust Litig., 470 F.3d 785, 791 (8th Cir. 2006). An antitrust injury is "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

FICO asserts that its dependency on the credit bureaus for access to credit data and its customers "is what gives rise to FICO's antitrust injury." For support, FICO relies on Full Draw Productions v. Easton Sports, Inc., 182 F.3d 745 (10th Cir. 1999), to demonstrate that a plaintiff has suffered antitrust injury when it is dependent on competitors who control its essential inputs or distribution chains. But the Tenth Circuit found that Full Draw Productions had suffered antitrust injury because its competitors acted in concert to achieve a boycott that "reduced the number of competitors in the market from two to one, thereby decreasing competition and harming consumers," id. at 754, not solely because Full Draw Productions was dependent on its competitors for access to inputs and customers. The record supports FICO's assertion that it has been denied access to credit data in the past, but not that the credit bureaus used a concerted effort to deny FICO access to its customers and credit data. Instead, FICO's alleged damages—losses stemming from VantageScore's mere existence in the market and from FICO lowering its prices to compete—do not constitute antitrust injury.

Nevertheless, FICO argues that it has suffered an antitrust injury because "[w]hen a plaintiff is the target of an illegal conspiracy or an effort to monopolize a market, the plaintiff *ipso facto* has suffered an injury that is cognizable under the antitrust laws." In the cases cited to support this assertion, however, the plaintiffs were not only the target of an allegedly illegal conspiracy but had also suffered antitrust injury.[3] Indeed, a plaintiff may be targeted and found to have not suffered

---

[3]See Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 316-17 (4th Cir. 2007) (finding that the plaintiff had pleaded facts sufficient to demonstrate antitrust injury including that Microsoft's activities were intended to and did restrain competition in

an injury that is cognizable under the antitrust laws. See, e.g., Atl. Richfield Co., 495 U.S. at 331-39 (describing strategy designed to compete "more effectively with discount independents such as [the plaintiff]" and holding that "[a]lthough a vertical, maximum-price-fixing agreement is unlawful under § 1 of the Sherman Act, it does not cause a competitor antitrust injury unless it results in predatory pricing."); Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc., 802 F. Supp. 1544, 1549 (S.D. Tex. 1991) ("Under this principle, since [plaintiff] could not have suffered injury as a result of a price-fixing conspiracy, it cannot prevail even if it were a target of the conspiracy.").

FICO's second alleged antitrust injury that it, as a customer, has been harmed from reduced credit-data quality and thus has standing also fails. FICO utilizes credit data for developing new credit score algorithms or modifying those in existence.

---

the PC operating-system market by keeping the barriers to entry into that market high); Glen Holly Entm't, Inc. v. Tektronix, Inc., 343 F.3d 1000, 1013 (9th Cir. 2003) ("The strategic alliance set out to exterminate Lightworks and allegedly succeeded, leaving only one product, no choices, and no competition in its wake. . . . [This] is a case where the plaintiff has alleged an unlawful agreement, dressed up as a competitor collaboration, to kill off a product in order to end competition, and a case where the plaintiffs' business which used that product was directly and intentionally strangled in the consummation of that agreement."); Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 274-75 (3d Cir. 1999) (describing that the plaintiff "alleges a concerted effort to exclude him from the market for cardiothoracic surgery" and that he suffered injury when he was "shut out of competition for anticompetitive reasons" that flowed directly from the conspiracy); ES Dev., Inc. v. RWM Enters., Inc., 939 F.2d 547, 554-55 (8th Cir. 1991) ("The evidence here, however, compels the inference that the dealers chose to exercise their individual legal rights in a concerted manner designed to impair plaintiffs' ability to procure franchise commitments from various manufacturers."); Chapdelaine Corp. Secs. & Co. v. Depository Trust & Clearing Corp., No. 05 Civ. 10711(SAS), 2006 WL 2020950, *4 (S.D.N.Y. July 13, 2006) (finding that plaintiff sufficiently pleaded antitrust injury where "[a]s a result of Depository's alleged conduct, [plaintiff] has been effectively foreclosed from competing in the relevant market, thus decreasing the number of alternatives available to consumers of such products.").

FICO asserts that the credit bureaus' agreement to use only part of their data for the VantageScore credit-score algorithm—a process FICO calls "leveling"—alters the bureaus' incentives to compete on the quality and content of the remaining data not utilized by the algorithm. According to FICO, "[b]ecause the predictive capacity and value of FICO scores depends directly on the quality and improvement of the underlying data supplied by the bureaus, FICO as a direct customer is injured as a result of this reduction in competition among the bureaus."

To support this assertion, FICO presented an expert's report, which stated that the "failure to improve databases will harm consumers by slowing progress in the quality of scores" and that leveling results in less accurate credit scores, both of which are not harms that FICO itself incurs as a consumer of credit data. The report also hypothesized about "a market in which the internal scoring models are phased out and [FICO] is disabled due to exclusionary behavior." In this hypothetical market, competition among the bureaus will be eliminated and the bureaus will no longer compete on the content of their databases.

But the report describes a hypothetical market—it is not evidence of current market conditions of reduced credit-data quality. Experian and VantageScore contend that "[i]t is implausible, and an impermissible inference absent additional evidence, to suggest that [the credit bureaus] may some day diminish their data innovation efforts because of a single scoring algorithm (VantageScore) that represents a trivial portion of sales." We conclude that FICO's evidence does not establish that it has suffered antitrust injury because of reduced credit-data quality. Moreover, FICO lacks standing to pursue claims for any alleged damage to consumers choosing the leveled, "less accurate" VantageScore credit scores.

Accordingly, we conclude that FICO has failed to demonstrate that it has suffered any antitrust injury that would entitle it to seek damages under § 4 of the Clayton Act. In order to seek injunctive relief under § 16 of the Clayton Act, a private

plaintiff must allege threatened loss or damage "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 113 (1986). "Section 16's requirement of 'threatened injury,' dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and immediate,' not 'conjectural' or 'hypothetical.'" In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 14 (1st Cir. 2008). "There must be some immediacy or imminence to the threatened injury." Id.

For the same reasons that FICO's § 4 claims fail, its assertion of threatened loss or damage also fails. The district court noted that in the business-to-business market segment, "[FICO]'s share decreased less than 1% in the first two years of VantageScore's existence," and in the consumer-direct segment, "[FICO]'s share of the consumer-direct segment increased 3% from the year prior to the introduction of VantageScore." Fair Isaac Corp. v. Experian Info. Solutions, Inc., 645 F. Supp. 2d 734, 754-55 (D. Minn. 2009). Thus, FICO has failed to demonstrate the threat of an immediate injury that might support injunctive relief. Moreover, FICO has entered into a "preferred partnership" with Equifax, ensuring FICO's access to credit data and distribution channels through 2013.

## B. Trademark

FICO asserts that the district court erred in finding on summary judgment that its registered "300-850" mark was merely descriptive. FICO's trademark infringement claims required it to prove that it owned a valid, distinctive trademark entitled to protection. B & B Hardware, Inc. v. Hargis Indus., Inc., 569 F.3d 383, 389 (8th Cir. 2009). Although a registered mark enjoys a presumption of validity, 15 U.S.C. § 1115(a), that presumption may be rebutted. Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 869 (8th Cir. 1994).

Descriptive terms are "generally not protectible because they are needed to describe all goods of a similar nature. Such a term describes the ingredients, characteristics, qualities, or other features of the product and may be used as a trademark only if it has acquired a secondary meaning." Schwan's IP, LLC v. Kraft Pizza Co., 460 F.3d 971, 974 (8th Cir. 2006). A mark acquires secondary meaning when it is "so associated with the product that it becomes a designation of the source rather than of a characteristic of the product." Id. A mark is suggestive and inherently distinctive and protectible if it requires "imagination, thought, and perception to reach a conclusion as to the nature of the goods." Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc., 426 F.3d 1001, 1005 (8th Cir. 2005).

FICO contends that the marks are not merely descriptive because when FICO "adopted the 300-850® mark it had no meaning in the credit-scoring industry," and that there is no competitive need for the score range to be 300-850 or even numeric. Our cases have often determined whether a mark is descriptive by referring to the goods associated with the mark. Schwan's IL, LLC, 460 F.3d at 975 ("We conclude that summary judgment was appropriate and that the district court correctly held that Brick Oven, as used to identify pizza, is a generic term."); Frosty Treats, Inc., 426 F.3d at 1005 ("If it is not generic, the phrase 'Frosty Treats' is, at best descriptive. Frosty Treats is in the business of selling frozen desserts out of ice cream trucks. 'Frosty Treats' conveys an immediate idea of the qualities and characteristics of the goods that it sells.").

FICO asserts that Experian and VantageScore were required to show that consumers of credit-scoring services view its mark as merely descriptive to rebut the mark's presumption of validity and that they failed to satisfy this burden. The test for descriptiveness is "what consumers, not persons in the trade, understand the term to be." See Anheuser-Busch Inc. v. Stroh Brewery Co., 750 F.2d 631, 637-38 (8th Cir. 1984). Experian and VantageScore presented evidence that the mark conveyed the approximate range of FICO's credit scores and that FICO had selected the mark for

that reason. They also presented evidence of how FICO used its mark in the credit-scoring market, which Experian and VantageScore argued was to "inform consumers that their credit scores will fall within that range of numbers." FICO contends that none of this evidence demonstrated that consumers considered the mark to be merely descriptive.[4] We disagree, for FICO's use of the mark in the credit-score market is evidence of what consumers perceive the mark to be. Viewing the evidence in the light most favorable to FICO, there is no genuine issue of fact that consumers in this market immediately understand "300-850" to describe the qualities and characteristics of FICO's credit score—that the credit score will be within the range of 300-850. Accordingly, we conclude that the district court did not err in finding the "300-850" mark to be merely descriptive.

### C. Fraud on the Patent and Trademark Office

FICO alleges that there was insufficient evidence to support the jury's conclusion that it procured the "300-850" trademark registration by fraud. "Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." In re Bose Corp., 580 F.3d 1240, 1243 (Fed. Cir. 2009). "[B]ecause direct evidence of

---

[4]FICO asserts that Experian and VantageScore were required to present evidence, such as consumer surveys, showing how consumers understood the mark. In Schwan's IP, LLC, we stated that in deciding genericness, "evidence of the relevant public's understanding of a term 'may be obtained from any competent source.'" 460 F.3d at 974. This reasoning similarly applies when determining descriptiveness. Thus, a party may establish that a mark is descriptive with evidence such as newspapers and other publications; use by the competitors; use of the term by the mark owner; and use of the term by third parties in trademark registrations, id. at 974-75, and "exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the [mark owner's] established place in the market; and the existence of intentional copying," Frosty Treats, Inc., 426 F.3d at 1005.

deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence. But such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." Id. at 1245.

The jury found that (1) FICO made a false representation during the application process to the PTO for the registrations of the "300-850" marks, (2) FICO knew that representation to be false when it was made and intended to deceive the PTO, and (3) the PTO relied on the false representation in deciding to issue the registrations. FICO challenges the sufficiency of the evidence for each finding. We review the evidence "in the light most favorable to the verdict and will not set it aside unless no reasonable jury could have reached the same verdict based on the evidence submitted." Masters v. UHS of Del., Inc., 631 F.3d 464, 469 (8th Cir. 2011).

At trial, Experian and VantageScore presented two statements to support their fraud on the PTO counterclaim. FICO made these statements in response to the PTO's initial denial of its application to register "300-850" on the ground that the mark was merely descriptive. FICO's employee Cheryl St. John stated that "[t]o the best of [her] knowledge, only the FICO score uses the 300-850 range as a unique identifier for credit bureau risk scores." FICO asserts that the statement is true because no one else used the range as a "unique identifier," and thus the jury had no basis to conclude that the statement was false. Experian and VantageScore assert that FICO did not use the mark as a unique identifier, i.e., as a trademark. FICO rejoins that it had attached a specimen to its trademark application demonstrating its use of the mark as a trademark. TransUnion's expert testified that St. John's testimony was false because FICO did not use "300-850" to identify the source of FICO's products as a unique identifier, that is, as a trademark, and that "300-850" was used only to identify a credit score range, similar to other credit-score ranges. The jury heard FICO's argument that it only used 300-850 as a trademark to identify source, and a

-11-

reasonable jury could have rejected FICO's contention and determined that the statement was false.

FICO's outside legal counsel also made a statement in response to the PTO's initial rejection of registration. She stated that the mark was not descriptive because "300-850 is the credit scoring scale only for [FICO's] credit bureau-based risk products and not for . . . other credit bureau-based risk products that competitors develop." FICO alleges that this statement too is true when considered in the proper context of counsel's paraphrase of St. John's statement that only FICO used "300-850" as a unique identifier. FICO asserts that because TransUnion—the only other credit bureau using a 300-850 range—admitted that it was not using it as a unique identifier, the evidence was insufficient to support the jury's finding that the statement was false. A reasonable jury could conclude, however, from TransUnion's use of the 300-850 credit score range, that counsel's statement was false.

FICO contends that even if the statements are considered false, there is insufficient evidence to establish that the statements were made knowingly with an intent to deceive the PTO. "When drawing an inference of intent, the involved conduct, viewed in light of all the evidence . . . must indicate sufficient culpability to require a finding of intent to deceive." In re Bose Corp., 580 F.3d at 1245 (internal quotation marks omitted). Experian and VantageScore presented evidence that as early as 2004, prior to St. John's statement to the PTO, (1) she was aware that FICO and others were using the same credit-score range, for the same purpose, and (2) that she knew that FICO was not using "300-850" as a trademark. Experian and VantageScore contend that St. John's attempt to deceive the PTO is confirmed by her "artful" use of the phrase "unique identifier." See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1191 (Fed. Cir. 1993) ("We conclude, as did the district court, that the inference of an intent to deceive the PTO is strongly supported by the submission of these deceptive affidavits."). Experian and VantageScore also assert that FICO's outside counsel—who had a duty to "make a reasonable inquiry in

-12-

support of any factual representations"—knew that FICO was not using "300-850" as a trademark when she responded to the PTO's initial rejection of the registration. We conclude that a reasonable jury could have inferred that FICO had an intent to deceive the PTO.

FICO contends that even if the statements about third-party use of "300-850" were false and intentionally made, they would have no bearing on whether the mark was descriptive, and that the statements thus were not material to the PTO's determination to register the mark. FICO asserts that third-party use would have been material only if another's rights were superior in the mark, which TransUnion's were not, considering its disclaimer of any use of 300-850 as a mark. FICO argues that because its registration was filed as an intent-to-use application, whether TransUnion previously used the mark "could never be material."

Experian and VantageScore presented a PTO expert, who testified that a reasonable examiner would consider it important in deciding whether to allow the registration to know whether others were using 300 to 850 as a score range for credit scoring services. Furthermore, the PTO had initially rejected FICO's "300-850" trademark application because it was merely descriptive and did not issue the registration until after FICO had made the two statements. Thus, there was sufficient evidence for a reasonable jury to determine that the PTO relied on a false representation in deciding whether to issue the registration.

D. Licensee Estoppel

In February 2006, Experian signed a license agreement that permitted Experian to use FICO's 300-850 trademark and which contained a no-contest provision stating that Experian would not "challenge the validity of [FICO's] exclusive rights" to its trademarks. FICO asserted trademark infringement claims against Experian and VantageScore. During trial, the district court overruled FICO's objection to the

introduction of evidence by Experian that FICO's trademarks were invalid. Following trial, FICO moved for judgment as a matter of law on the issue of licensee estoppel, requesting a new trial that "precludes Defendants from presenting evidence and argument challenging whether the mark is entitled to protection." Fair Isaac Corp. v. Experian Info. Solutions, Inc., 711 F. Supp. 2d 991, 1001 (D. Minn. 2010). FICO asserted that VantageScore was under the absolute control of Experian and the other credit bureaus and therefore was precluded from challenging FICO's mark under principles of agency and equity. The district court found that VantageScore was not a licensee or precluded from challenging the validity of FICO's rights in the marks. Accordingly, the issue would have been submitted to the jury regardless of whether Experian was precluded from raising a challenge to the mark's validity.

We review *de novo* the district court's denial of a motion for judgment as a matter of law, applying the same standard used by that court. Matthew v. Unum Life Ins. Co. of Am., 639 F.3d 857, 866 (8th Cir. 2011). The doctrine of licensee estoppel provides that a licensee is estopped from contesting the validity of its license. See C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P., 505 F.3d 818, 825 (8th Cir. 2007); Seven-Up Bottling Co. v. Seven-Up Co., 561 F.2d 1275, 1279 (8th Cir. 1977) ("The establishment of an existing licensor-licensee relationship between Company and [licensee] effectively constitutes an insuperable bar to recovery by [licensee] with regard to its trademark claims."). "The licensee estoppel rule precludes only licensees from a challenge: other parties, even those closely affiliated with the licensee, are not foreclosed." 3 McCarthy on Trademarks and Unfair Competition § 18.63 (4th ed. 2011); see also Papercraft Corp. v. Gibson Greeting Cards, Inc., 515 F. Supp. 727, 728-29 (S.D.N.Y. 1981) (holding that parent corporation was not estopped from challenging mark which licensor had licensed to wholly owned subsidiary, which was independent of parent and had separate employees, records, accounts, offices and only one shared officer).

VantageScore is a limited liability company that is distinct from its three joint shareholders. FICO contends, however, that VantageScore is the "alter ego" of the bureaus and therefore "was prohibited from doing what Experian and TransUnion themselves could not do under their licenses." If a licensor can produce sufficient evidence that an agent is an alter ego of the licensee, the agent may also be estopped from challenging a trademark under the doctrine of licensee estoppel. See, e.g., Delex, LLC v. Delivery Express, Inc., No. CV-02-237-ST, 2002 WL 31466586, *4 (D. Or. Apr. 25, 2002) (stating that corporation was likely bound as an alter ego of licensee because the businesses were formed simultaneously, for the same purpose, sharing common officers, and jointly operating their website).

The district court acknowledged FICO's assertion that VantageScore was "under the absolute control of the credit bureaus." But FICO did not present evidence, nor did the district court find, that VantageScore was the alter ego of Experian or the three credit bureaus collectively. Accordingly, we agree with the district court that VantageScore was not a licensee and therefore was not estopped from challenging the mark under either a theory of agency or equity.

FICO asserts that its trademark should have been deemed valid regarding its claims against Experian, even if VantageScore was allowed to challenge the registration. A mark that is invalid cannot be infringed. See Aromatique, Inc., 28 F.3d at 875 ("Thus, the court today does not reach the issue of whether Gold Seal infringed the asserted trademarks: the marks are invalid so there is nothing to infringe."). Because VantageScore successfully challenged the mark, it cannot serve as the basis of an infringement action.

E. False Advertising

On its website, Experian advertises its in-house credit score, called the "PLUS Score," which has a range of 330-830 and the phrase "[s]ee the same type of score that

lenders see." According to FICO, "[b]y featuring a range nearly identical to the 300-850® mark, and by suggesting that the Plus score is used by most lenders, Experian is falsely advertising its products in a manner intended to mislead consumers into believing they are buying either the FICO® score or a score widely used by lenders, neither of which is true." Experian contends "same type" means, a three-digit numerical representation of an individual's credit risk based on credit report information and calculated using a credit-score algorithm. FICO asserts that no lenders use the PLUS Score and refers to Experian's own documents demonstrating consumers' confusion regarding whether they are buying a score used by lenders when purchasing the PLUS Score. FICO asserts that because Experian's advertising is "both literally false and misleading," the district court erred in granting summary judgment dismissing FICO's false-advertising claims.

To establish a claim of false advertising, FICO must establish the following:

> (1) a false statement of fact by [Experian] in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) [Experian] caused its false statement to enter interstate commerce; and (5) [FICO] has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to [Experian] or by a loss of goodwill associated with its products.

United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998). A statement may be literally false, conveying an "explicit factual message" and in fact be false, 3M Innovative Properties Co. v. Dupont Dow Elastomers LLC, 361 F. Supp. 2d 958, 969 (D. Minn. 2005), or may be implicitly false, conveying "the implied message and thereby deceiv[ing] a significant portion of the recipients," United Indus. Corp., 140 F.3d at 1182. A claim that a statement is implicitly false requires proof that the statement is deceptive or misleading, and the success of such a claim usually turns on the persuasiveness of a consumer survey. Id. at 1183.

-16-

We agree with the district court that the statement was not literally or implicitly false. Consumers purchasing Experian's PLUS Score are seeing a credit score of the "same type" that lenders see, namely a score indicative of how lenders would assess an individual's creditworthiness. Contrary to FICO's assertion, nothing about Experian's statement, explicitly or implicitly, suggested that most lenders actually use the PLUS Score. Experian's call scripts—the only evidence FICO presented—did not demonstrate that there was an implicitly false message conveyed that had the tendency or deceived a significant segment of the advertisement's audience. Accordingly, we conclude that FICO's false advertising claims were properly dismissed.

## F. Attorneys' Fees

The Lanham Act provides that a court "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a); Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1013 (8th Cir. 2011); see also Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC, 626 F.3d 958, 960-63 (7th Cir. 2010) (summarizing the different circuit tests for determining when a case is exceptional).

Experian and VantageScore contend that the district court abused its discretion by finding that this case was not exceptional. We review the district court's decision whether to award attorneys' fees under an abuse-of-discretion standard. Scott Fetzer Co. v. Williamson, 101 F.3d 549, 555 (8th Cir. 1996). An abuse of discretion occurs "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984). We have held that an exceptional case is one in which the plaintiff's action was groundless, unreasonable, vexatious, or pursued in bad faith. Aromatique, Inc., 28 F.3d at 877.

-17-

Experian and VantageScore assert that the jury's finding that FICO had engaged in fraud on the PTO weighs heavily in favor of finding the case exceptional. They contend that the district court misunderstood their argument seeking attorneys' fees and assert that it failed to consider the "equities" of this case. These equities, they contend, consisted of FICO's "substantial delay in asserting trademark rights in '300-850,' the lack of secondary meaning evidence, the lack of any efforts by FICO to develop consumer recognition of the term as a brand, FICO's knowledge of widespread third-party use of the same or similar score ranges" as early as 2003, and FICO's "stated desire to pursue litigation in the aftermath of the VantageScore's launch" to hinder or stifle it. The district court considered each of these arguments. In concluding that this was not an exceptional case, it stated that it could not find that FICO's claims were "wholly without merit." Fair Isaac Corp. & myFICO Consumer Servs., Inc. v. Experian Info. Solutions, Inc., 711 F. Supp. 2d 991, 1011 (D. Minn. 2010). It noted that FICO had presented sufficient evidence to survive motions for summary judgment and judgment as a matter of law, which was "inconsistent with the contention that [FICO's] infringement claims were groundless and unreasonable." Id. We cannot say that the district court abused its discretion in determining that this case was not exceptional, and thus we affirm the order denying the motion for attorneys' fees.

### III.  Conclusion

The judgment is affirmed.

_____

-18-